# RASPBERRY JUNCTION HOLDING, LLC *v.*
## SOUTHEASTERN CONNECTICUT
## WATER AUTHORITY
### (SC 20454)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Kahn, Ecker and Keller, Js.

*Syllabus*

The plaintiff, the owner of a hotel, sought to recover damages from the
defendant municipal water authority for economic losses it incurred in
connection with an explosion at the defendant's pumping station, which
allegedly was caused by the defendant's negligence and resulted in an
extended interruption of water service at the plaintiff's hotel and loss
of revenue. The defendant moved for summary judgment, contending,
inter alia, that the plaintiff's claim was barred by the economic loss
doctrine. The trial court granted the defendant's motion for summary
judgment and rendered judgment thereon, concluding that the defendant
owed the plaintiff no legal duty of care. In reaching its decision, the
court determined that, although the plaintiff's economic losses were
reasonably foreseeable, imposing a duty on the defendant was inconsis-
tent with public policy, as determined by the applicable four factor test
first articulated in *Jaworski* v. *Kiernan* (241 Conn. 399), which requires
a court to consider the normal expectations of the participants in the
activity, the public policy of encouraging participation in the activity
while weighing the safety of the participants, the avoidance of increased
litigation, and the decisions of other jurisdictions. On the plaintiff's

340 Conn. 200 DECEMBER, 2021 201

Raspberry Junction Holding, LLC *v.* Southeastern Connecticut Water Authority

appeal from the judgment in favor of the defendant, *held* that the trial court correctly determined that the defendant owed the plaintiff no legal duty of care because, although it was reasonably foreseeable that an extended interruption of water service would cause economic losses for any of the defendant's customers whose livelihood depended on the constant supply of water, each of the four factors in *Jaworski* militated against imposing a duty on the defendant, as a matter of public policy, under the circumstances of the case: the normal expectations of the parties in the purchase and sale of water militated decisively against the imposition of a duty because the relevant statutory and case law compelled the conclusion that neither party reasonably could have expected that the defendant, a municipal corporation, would be liable in negligence for economic losses incurred by its customers as a result of an interruption in water service; moreover, imposing a duty on the defendant to prevent economic losses from interruptions in water service would result in a predictable increase in litigation without a corresponding increase in the physical safety of the defendant's customers, and, because water is an essential necessity of life, its use requires no encouragement by the law; furthermore, the vast majority of other jurisdictions bar recovery for economic losses in a negligence action arising out of damage to the person or property of another, and this court rejected the plaintiff's contention that this factor weighed in favor of imposing a duty because a number of jurisdictions recognize an exception to the general rule barring recovery when a special relationship exists between the parties, as the plaintiff did not identify any attribute of its relationship with the defendant that would bring the present case into the extremely limited class of negligence cases that do not bar recovery for economic losses.

(*One justice concurring separately*)

Argued January 15—officially released August 18, 2021*

*Procedural History*

Action to recover damages sustained as a result of the defendant's alleged negligence, and for other relief, brought to the Superior Court in the judicial district of New London, where the court, *Vacchelli, J.*, granted the defendant's motion for summary judgment and rendered judgment thereon, from which the plaintiff appealed; thereafter, this court reversed the trial court's judgment and remanded the case for further proceedings; on remand, the court, *Calmar, J.*, granted the

* August 18, 2021, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

Raspberry Junction Holding, LLC *v.* Southeastern Connecticut Water Authority

defendant's motion for summary judgment and rendered judgment thereon, from which the plaintiff appealed. *Affirmed.*

*Santa Mendoza*, for the appellant (plaintiff).

*Stephanie S. Berry*, with whom, on the brief, was *Christopher C. Ring*, for the appellee (defendant).

*Opinion*

KELLER, J. The plaintiff, Raspberry Junction Holding, LLC, the owner of a 164 room hotel in North Stonington, commenced this negligence action against the defendant, Southeastern Connecticut Water Authority, a municipal corporation that provides water to twenty-one towns and boroughs in southeastern Connecticut, seeking damages for economic losses it incurred when an explosion at the defendant's North Stonington pumping station caused an interruption in the hotel's water service. The defendant moved for summary judgment, contending that (1) it was immune from liability under rules it had adopted pursuant to the rule-making authority conferred on it by the legislature, and (2) the plaintiff's claim was barred by the economic loss doctrine, a common-law rule, which, "generally characterized, reflects the principle that a plaintiff cannot sue in tort for purely monetary loss unaccompanied by physical injury or property damage." *Raspberry Junction Holding, LLC* v. *Southeastern Connecticut Water Authority*, 331 Conn. 364, 368 n.3, 203 A.3d 1224 (2019). The trial court, *Vacchelli, J.*, agreed with the defendant's first contention and granted its motion for summary judgment. Id., 368. The plaintiff appealed, and this court reversed the trial court's judgment and remanded the case for consideration of the defendant's alternative ground for summary judgment. Id., 378. Presently

Raspberry Junction Holding, LLC *v.* Southeastern Connecticut Water Authority

before us is the plaintiff's appeal[1] from the judgment of the trial court, *Calmar, J.*, again granting the defendant's motion for summary judgment, this time on the theory that the defendant owed the plaintiff no legal duty of care. On appeal, the plaintiff claims that the trial court incorrectly determined that the defendant could not be held liable for the plaintiff's losses because public policy does not support the imposition of a duty on the defendant under the circumstances of this case. We disagree and, accordingly, affirm the judgment of that court.

The following undisputed facts and procedural history are relevant to our resolution of this appeal. "The defendant was created in 1967 by a special act of the General Assembly as a body politic and corporate of the state, designated to perform the 'essential government function' of planning, operating, and maintaining a water supply system for the benefit of the southeastern Connecticut planning region. 33 Spec. Acts 478, No. 381 (1967) (special act).[2] Section 14 of [the special] act sets forth the powers and duties conferred on the defendant, including 'the power . . . to make . . . rules for the sale of water and the collection of rents and charges therefor . . . [and] to do all things necessary or convenient to carry out the powers expressly given in [the] act . . . .' 33 Spec. Acts 481, 483–84, No. 381, § 14 (1967)." (Footnote altered.) *Raspberry Junction Holding, LLC* v. *Southeastern Connecticut Water Authority*, supra, 331 Conn. 366–67.

"The [defendant] is a publicly owned agency of government, not a private company. Its function, simply

[1] The plaintiff appealed from the trial court's judgment to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] Although the special act has been amended several times since 1967, those amendments are not relevant to this appeal. All references herein are to the 1967 special act.

stated, is to plan, operate and construct water supply systems in Southeastern Connecticut. The underlying consideration in the creation of the [defendant] by the legislature, in response to local initiatives, was that the long range public interest is best served by a collective and cooperative approach to the water supply requirements, present and future.'' Southeastern Connecticut Water Authority, Rules Governing Water Service, available at https://www.waterauthority.org/rules-governing-service (last visited August 9, 2021).

The defendant consists of seven members appointed by the representative advisory board (advisory board), which is comprised of two members from each of the twenty-one towns and boroughs served by the defendant. Id. Advisory board members are appointed by the board of selectmen or town council from each town or borough for a term of two years and serve without compensation. See 33 Spec. Acts 479, No. 381, §§ 4 and 5 (1967). ''The [advisory board], in addition to appointing [the defendant's] members, annually audits the financial records of the [defendant]. It also holds public hearings on proposed changes in rates. Within the [advisory board], there are several standing committees, including [f]inance, [l]egislative, and [c]ustomer [a]ppeals. The [c]ustomer [a]ppeals [c]ommittee's purpose is to resolve misunderstandings between the [defendant] and its customers. [Each] town's [advisory board] members are [the] direct representatives [of the defendant's customers] . . . .'' Southeastern Connecticut Water Authority, supra.

''In 2016, the plaintiff commenced the present action against the defendant, seeking damages [for] a loss of water service at [its hotel] . . . . In its one count complaint, the plaintiff alleged that the hotel lost water service for several days in June, 2015, due to the explosion of a hydropneumatic tank at a pumping station operated by the defendant as a result of the defendant's

Raspberry Junction Holding, LLC *v.* Southeastern Connecticut Water Authority

negligent construction, operation, inspection or mainte- nance of the tank and its valves. The plaintiff further alleged that the water outage caused the plaintiff to lose revenue due to its inability to rent rooms and the need to give refunds to hotel guests during the water outage.

"The defendant moved for summary judgment on two grounds. First, it contended that rule 5 [of the defendant's 'Rules Governing Water Service'] immu- nized it from liability for the plaintiff's damages . . . . Second, it contended that, because the plaintiff was seeking damages for monetary loss only, the claim is barred by the common-law economic loss doctrine. The plaintiff opposed the motion, arguing that the defen- dant, as a municipal corporation engaged in a proprie- tary function, is not immune from suit and has no authority, express or implied, to promulgate rules that waive liability for negligence. The plaintiff also argued that the economic loss doctrine does not apply under the circumstances presented." (Citation omitted; foot- note omitted.) *Raspberry Junction Holding, LLC* v. *Southeastern Connecticut Water Authority*, supra, 331 Conn. 367–68.

The trial court, *Vacchelli, J.*, agreed with the defen- dant's first contention and rendered summary judgment in the defendant's favor. Id., 368. On appeal, this court reversed the trial court's judgment on the basis of our determination that the legislature did not authorize the defendant to promulgate rules immunizing itself from liability. Id., 370. In light of that determination, we remanded the case to the trial court for consideration of the defendant's alternative ground for summary judg- ment, namely, that the plaintiff's claim was barred by the economic loss doctrine. Id., 378.

On remand, the parties filed additional briefs in sup- port of their respective positions. Following oral argu-

ment, the trial court, *Calmar, J.*, issued a memorandum of decision in which it granted the defendant's motion for summary judgment. The trial court, citing *Lawrence* v. *O & G Industries, Inc.*, 319 Conn. 641, 664, 126 A.3d 569 (2015), explained that the economic loss doctrine is a common-law rule intended "to shield a defendant from unlimited liability for all of the economic consequences of a negligent act, particularly in a commercial or professional setting, and thus to keep the risk of liability reasonably calculable." (Internal quotation marks omitted.) The trial court further explained that this court previously has declined to apply the economic loss doctrine as a categorical bar to the recovery of purely economic losses in a tort action, opting instead to apply a traditional duty analysis to the question of whether a defendant's liability should extend to such losses. Applying this analysis, the trial court concluded that the defendant owed the plaintiff no legal duty of care.

In reaching its determination, the court, quoting *Lawrence*, explained that whether a duty exists turns on two considerations, the foreseeability of the harm and "a determination, on the basis of a public policy analysis, of whether the defendant's responsibility for its negligent conduct should extend to the particular consequences or particular plaintiff in the case." (Internal quotation marks omitted.), quoting *Lawrence* v. *O & G Industries, Inc.*, supra, 319 Conn. 650. The court further explained that, in determining whether public policy supports the imposition of a duty, courts apply the well established test first articulated in *Jaworski* v. *Kiernan*, 241 Conn. 399, 407, 696 A.2d 332 (1997), which requires courts to consider the following four factors: "(1) the normal expectations of the participants in the activity under review; (2) the public policy of encouraging participation in the activity, while weighing the safety of the participants; (3) the avoidance of increased litiga-

Raspberry Junction Holding, LLC *v.* Southeastern Connecticut Water Authority

tion; and (4) the decisions of other jurisdictions.'' (Internal quotation marks omitted.) *Lawrence* v. *O & G Industries, Inc.*, supra, 650. Applying these well established principles, the court determined that, although the plaintiff's economic losses were reasonably foreseeable, imposing a duty on the defendant was inconsistent with public policy, as determined by the applicable four factor test.

Specifically, the trial court concluded that, although the first factor favored the plaintiff ''slightly'' insofar as water service customers generally expect an interruption in service to be ''temporary,'' lasting hours rather than days, the remaining three factors weighed against the imposition of a duty. With respect to the second factor, the court concluded that using water is not an activity that requires the encouragement of the law, and, because the defendant already may be held liable for personal injury or property damage resulting from its negligence, ''[i]mposing a duty on the defendant to hold it liable for economic losses would . . . not positively impact safety because it would not increase [the defendant's] impetus to act with due care.'' (Internal quotation marks omitted.) With respect to the third factor, the court determined that it too ''weigh[ed] heavily against imposing a duty on the defendant,'' explaining that, ''[s]hould the defendant ever need to halt its [water] service . . . in the future, it is possible that all of its affected customers, both residential and commercial, could initiate an action against [it] . . . [potentially] flooding the courts with spurious and fraudulent claims'' and exposing the defendant to ''endless'' litigation. (Internal quotation marks omitted.)

Finally, the trial court concluded that the fourth factor also weighed decisively against the imposition of a duty. Specifically, the court noted that most jurisdictions ''bar a plaintiff from recovering purely economic losses in [a] tort [action] in the absence of personal

Raspberry Junction Holding, LLC *v.* Southeastern Connecticut Water Authority

injury or property damage.'' The court reasoned that, were it to find that the defendant owed a duty to the plaintiff, it ''would expose [the defendant] to potentially limitless liability,'' the costs of which would be borne by the defendant's other customers in the form of increased rates. The court also noted that, even in those jurisdictions that permit the recovery of purely economic losses in a negligence action, a plaintiff must establish that a special relationship existed between the parties such that the plaintiff's losses were ''particularly foreseeable'' to the defendant, which the plaintiff in the present case could not do.

On appeal, the plaintiff claims that the trial court incorrectly determined that the defendant owed the plaintiff no duty of care. Specifically, the plaintiff contends that the trial court, in analyzing the second and third factors of the public policy prong of the duty analysis, incorrectly concluded that, because the defendant may be held civilly liable for physical injury and damage to property resulting from its negligence, imposing an additional duty on the defendant for economic losses would not address a valid safety concern. In support of this contention, the plaintiff argues that, because the defendant is not subject to extensive state or federal regulation and knows that ''even an extremely dangerous event'' such as a ''catastrophic explosion at a pumping station'' is unlikely to cause bodily injury or damage to the property of another, ''the possibility of civil liability for economic harm is perhaps the one and only avenue that would increase [the defendant's] impetus to act with due care.'' (Internal quotation marks omitted.) The plaintiff further contends that ''[t]he ubiquitous need for water, both for basic hygiene and health and also [for] fire safety . . . suggests that . . . Connecticut law . . . should be encouraging every effort to ensure the uninterrupted distribution of [that resource] . . . .'' The plaintiff finally contends that the trial court,

Raspberry Junction Holding, LLC *v.* Southeastern Connecticut Water Authority

in applying the fourth factor of the public policy analysis, failed to consider the "growing list of jurisdictions willing to extend liability in opposition to the economic loss doctrine when a special relationship exists [between the parties]." The plaintiff asserts that a special relationship exists between the parties in the present case as a result of the "imbalance of power" between them, which allows the defendant "to take advantage of or exercise undue influence over" the plaintiff, who, because of the defendant's monopoly over the supply of water in the plaintiff's area, has no choice but to purchase water from the defendant. (Internal quotation marks omitted.)

The defendant responds, inter alia, that the trial court correctly determined that it owed the plaintiff no legal duty of care. The defendant disagrees, however, with the trial court's determination that the plaintiff's economic losses were foreseeable, arguing instead that nonpotable water was restored to the plaintiff within twenty-four hours of the initial outage, while potable drinking water was provided free of charge until a new water system was installed. The defendant contends that the plaintiff's business losses were not the result of a lack of water but, rather, resulted from unforeseeable "restrictions put in place by a fire marshal . . . [who] limited the number of rooms the plaintiff could rent and required the plaintiff to patrol its hotel to accommodate a potential limitation on its ability to operate its sprinkler system." As for the public policy prong of the duty analysis, the defendant argues that the trial court correctly determined that it militates against the imposition of a duty, although the defendant disagrees with that court's determination that the first factor of the analysis favors the plaintiff, even slightly. The defendant contends, rather, that the normal expectations of the parties were met because, although uninterrupted water service may be the expectation, that expectation does

not apply when, as in the present case, there are exigent circumstances such as the explosion at the defendant's pumping station. The defendant further maintains that the parties' expectations were met in any event because the service interruption did not last for several days, as the plaintiff claims but, rather, for less than twenty-four hours, and the parties' contract alerted the plaintiff that service interruptions may occur at any time and for any reason. We conclude that the trial court correctly determined that the defendant owed the plaintiff no legal duty of care.

"Practice Book [§ 17-49] provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. . . . The party seeking summary judgment has the burden of showing the absence of any genuine issue [of] material facts which, under applicable principles of substantive law, entitle him to a judgment as a matter of law . . . . A material fact . . . [is] a fact [that] will make a difference in the result of the case." (Internal quotation marks omitted.) *Shoreline Shellfish, LLC* v. *Branford*, 336 Conn. 403, 410, 246 A.3d 470 (2020). The scope of our review of the trial court's decision to grant the defendant's motion for summary judgment is plenary. See id.

As we previously have explained, "[a] cause of action in negligence is comprised of four elements: duty; breach of that duty; causation; and actual injury. . . . Whether a duty exists is a question of law for the court, and only if the court finds that such a duty exists does the trier of fact consider whether that duty was breached." (Internal quotation marks omitted.) *Lawrence* v. *O & G Industries, Inc.*, supra, 319 Conn. 649. "If a court determines, as a matter of law, that a defendant owes no duty to a plaintiff, the plaintiff cannot

Raspberry Junction Holding, LLC *v.* Southeastern Connecticut Water Authority

recover in negligence from the defendant. . . . Duty is a legal conclusion about relationships between individuals, made after the fact, and imperative to a negligence cause of action. The nature of the duty, and the specific persons to whom it is owed, are determined by the circumstances surrounding the conduct of the individual. . . . Foreseeability is a critical factor in the analysis, because no duty exists unless an ordinary person in the defendant's position, knowing what the defendant knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result . . . . Our law makes clear that foreseeability alone, however, does not automatically give rise to a duty of care . . . . A further inquiry must be made, for we recognize that duty is not sacrosanct in itself . . . but is only an expression of the sum total of those considerations of policy [that] lead the law to say that the plaintiff is entitled to protection. . . . The final step in the duty inquiry, then, is to make a determination of the fundamental policy of the law, as to whether the defendant's responsibility should extend to such results. (Citations omitted; internal quotation marks omitted.) *Demond* v. *Project Service, LLC*, 331 Conn. 816, 834–35, 208 A.3d 626 (2019).

In *Lawrence*, in which a group of construction workers sought to recover lost wages after an explosion destroyed their work site; *Lawrence* v. *O & G Industries, Inc.*, supra, 319 Conn. 644–45; this court rejected a claim that, "independent of a duty analysis, [we] should adopt the economic loss doctrine as a 'categorical bar' to a plaintiff's recovery of 'economic loss . . . in tort absent damage to [the plaintiff's] person or property' " because such a bar was " 'in line' " with more than one century of Connecticut case law. Id., 648 n.8. In so doing, "we agree[d] with the trial court's observation that the '[economic loss] doctrine, as employed in tort cases to preclude a plaintiff's claim, is merely another

way of saying that the defendant[s] owed no duty to the plaintiff because the claimed loss was a remote and indirect consequence of the misconduct of the defendants.' '' Id.; see also *Eastwood* v. *Horse Harbor Foundation, Inc.*, 170 Wn. 2d 380, 389, 241 P.3d 1256 (2010) (''A review of [Washington] cases on the economic loss rule shows that ordinary tort principles have always resolved th[e] question [of liability]. An injury is remediable in tort if it traces back to the breach of a tort duty arising independently of the terms of the contract. The court determines whether there is an independent tort duty of care, and [t]he existence of a duty is a question of law and depends on mixed considerations of logic, common sense, justice, policy, and precedent.'' (Internal quotation marks omitted.)).

Our reluctance in *Lawrence* to adopt the economic loss doctrine as a categorical bar to recovery also reflected a desire to avoid the confusion that has arisen in jurisdictions that have adopted such a rule even though pure economic loss remained recoverable in those jurisdictions in a variety of tort contexts, including negligence. See, e.g., *Alma* v. *AZCO Construction, Inc.*, 10 P.3d 1256, 1263 (Colo. 2000) (''[S]ome torts are expressly designed to remedy pure economic loss (e.g., professional negligence, fraud, and breach of fiduciary duty). It is here that substantial confusion arises from the use of the term 'economic loss rule.' ''); see also Restatement (Third), Torts, Liability for Economic Harm § 1, comment (b), p. 2 (2020) (''[s]tating the absence of a duty as a general rule can create confusion by seeming to threaten [well established] causes of action, by leaving behind an uncertain and unwieldy number of exceptions, and by implying a needless presumption against the existence of a duty on facts not yet considered'').

The Restatement (Third) of Torts explains: ''Liability for the unintentional infliction of economic loss emerged

Raspberry Junction Holding, LLC *v.* Southeastern Connecticut Water Authority

only within the last [forty] years as a distinct topic for analysis within the law of torts. . . . References to an economic-loss 'rule' or 'doctrine' began to appear in American case law for the first time in the 1970s. The expression sometimes referred to the idea that a plaintiff cannot collect in tort for economic losses suffered as a result of injury to the person or property of another— a doctrine covered here in § 7 . . . . Other courts treated the economic-loss rule as meaning that plaintiffs cannot collect in tort when they buy products that disappoint their economic expectations . . . . Many courts have extended that principle from cases involving products to other cases [in which] a defendant's breach of contract causes financial losses to the plaintiff. . . . When articulating any of these doctrines, courts sometimes have spoken generally of a rule against recovery in tort for pure economic loss.

" 'Economic loss' thus has become a significant and distinct category within the law of liability for negligence. It has become a potent source of confusion as well. Courts have long assumed, often without much discussion, that no recovery can be had in tort for certain types of economic loss; but they also have long allowed recovery of economic losses in cases of professional malpractice and in certain other settings. . . . When some courts began to say that tort law should not be used to redress pure economic loss, they created uncertainty about whether [well established] causes of action still were valid, and about how one might separate emerging claims that survive the new rule from those that do not." (Citations omitted.) Restatement (Third), supra, § 1, reporter's note (a), pp. 6–7.

We note, finally, that, regardless of whether this court applies a duty analysis to the question of liability in cases such as the present one or applies some iteration of the economic loss doctrine as a categorical bar to recovery, as many courts have done, the outcome is

Raspberry Junction Holding, LLC *v.* Southeastern Connecticut Water Authority

likely to be the same because, as we have explained, the purpose of a duty analysis is to ascertain the fundamental policy of the law, and the economic loss doctrine is merely an expression of that policy as determined by other courts, in earlier cases.[3] With this background in mind, we turn to an analysis of the question presented, namely, whether the defendant owed the plaintiff a duty of care.

The first prong of that analysis is whether the harm complained of was foreseeable. As previously indicated, the defendant challenges the trial court's determination that, in the present case, it was foreseeable, arguing that the plaintiff's economic losses were the unforeseeable result of a fire marshal's decision to require the plaintiff's hotel to operate at one-half capacity until a new potable water system was installed, even though nonpotable water was restored within twenty-four hours and potable water was provided free of charge while the system was under repair. The plaintiff responds, and our independent review of the record confirms, that the defendant presented no evidence to the trial court to establish the factual predicates of this argument, and, therefore, it is not properly before us. See, e.g., *Sena* v. *American Medical Response of Connecticut, Inc.*, 333 Conn. 30, 53, 213 A.3d 1110 (2019) ("courts are in entire agreement that the moving party for summary judgment has the burden of [presenting evidence] showing the absence of any genuine issue as to all the material facts" (internal quotation marks omitted)); *Romprey* v. *Safeco Ins. Co. of America*, 310 Conn. 304, 321, 77 A.3d 726 (2013) ("[i]f the party moving for summary judgment fails to show that there are no genuine issues of material fact, the nonmoving party may rest on

[3] We note that the parties have not asked us to apply a different analysis to the question of whether the defendant should be liable for the plaintiff's economic losses; rather, they have briefed the issue in conformance with the duty analysis adopted in *Jaworski* and applied in *Lawrence*.

Raspberry Junction Holding, LLC *v.* Southeastern Connecticut Water Authority

mere allegations or denials contained in his pleadings''
(internal quotation marks omitted)). For purposes of
our analysis, therefore, we will assume that the water
outage at the plaintiff's hotel lasted ''several days,'' as
the plaintiff alleged in its complaint. Given that assump-
tion, we agree with the trial court that it was reasonably
foreseeable that a service interruption of that duration
would cause economic losses for any of the defendant's
customers whose livelihood depended on a constant
supply of water.

Our law makes clear, however, that ''[a] simple con-
clusion that the harm to the plaintiff was foreseeable
. . . cannot by itself mandate a determination that a
legal duty exists. Many harms are quite literally foresee-
able, yet for pragmatic reasons, no recovery is allowed.
. . . The final step in the duty inquiry, then, is to make
a determination of the fundamental policy of the law,
as to whether the defendant's responsibility should
extend to such results.'' (Internal quotation marks omit-
ted.) *Demond* v. *Project Service, LLC*, supra, 331 Conn.
834–35. As we have explained, in making that determi-
nation, our courts consider the following four factors:
''(1) the normal expectations of the participants in the
activity under review; (2) the public policy of encourag-
ing participation in the activity, while weighing the
safety of the participants; (3) the avoidance of increased
litigation; and (4) the decisions of other jurisdictions.
. . . [This] totality of the circumstances rule . . . is
most consistent with the public policy goals of our
legal system, as well as the general tenor of our [tort]
jurisprudence.'' (Internal quotation marks omitted.)
*Lawrence* v. *O & G Industries, Inc.*, supra, 319 Conn.
650–51. For the reasons that follow, we conclude that
each of these factors militates against the imposition of
a duty, and, therefore, imposing a duty on the defendant
would be contrary to sound public policy.

We begin with the normal expectations of the participants in the activity under review. In the present case, that activity is the purchase and sale of water, where the seller is a municipal corporation tasked with planning, operating, and maintaining a public water supply system, and the buyer is a member of the public for whose benefit the system and the defendant were created. The trial court concluded that this factor favored the plaintiff—albeit only "slightly"—because "[t]he normal expectation of a water delivery service customer is that, absent exigent circumstances, water will be provided" and that any interruption in service that does occur will be short lived. Although we agree with the trial court's analysis as far as it goes, by failing to take into account the reasonable expectations of the defendant, it did not go far enough. Our case law also establishes that, in applying this factor, courts must consider "Connecticut's existing body of common law and statutory law relating to this issue"; *Lawrence* v. *O & G Industries, Inc.*, supra, 319 Conn. 651; which the trial court failed to do. When these additional considerations are taken into account, we conclude that the first factor militates decisively against the imposition of a duty.

In considering the normal expectations of the parties in *Lawrence*, we explained that, for well over one century and in a variety of factual contexts, this court has denied recovery in negligence for economic losses resulting from injury to the person or property of another, in each instance concluding that the damages were simply too remote or the relationship between the parties too attenuated for a duty to be imposed on the defendant. See, e.g., id., 651–658 (citing and discussing cases); id., 643–44, 667 (plaintiff construction workers could not recover economic losses in form of lost wages from defendant construction companies whose negligence destroyed plaintiffs' work site, causing plaintiffs to lose their jobs); *RK Constructors, Inc.*

v. *Fusco Corp.*, 231 Conn. 381, 382–83, 650 A.2d 153 (1994) (employer could not maintain negligence action against third-party tortfeasor to recover economic losses in form of increased workers' compensation premiums resulting from tortfeasor's injury of employer's employee); *Connecticut Mutual Life Ins. Co.* v. *New York & New Haven Railroad Co.*, 25 Conn. 265, 276 (1856) (life insurance company could not recover life insurance benefits paid on behalf of its insured by bringing direct action against railroad company whose negligence caused insured's death); see also *Gregory* v. *Brooks*, 35 Conn. 437, 446 (1868) ("[when] one is injured by the wrongful act of another, and others are indirectly and consequentially injured, but not by reason of any natural or legal relation, the injuries of the latter are deemed too remote to constitute a cause of action"). Given this body of case law, which spans more than 150 years, we do not believe that the normal expectations of the parties in the present case reasonably could have included an expectation that the defendant would be liable in negligence for the economic losses of its customers under the circumstances of this case.

Our conclusion is reinforced by General Statutes § 52-557n (a) (1), which provides in relevant part: "Except as otherwise provided by law, a political subdivision of the state shall be liable for *damages to person or property* caused by . . . (B) negligence in the performance of functions from which the political subdivision derives a special corporate profit or pecuniary benefit . . . ." (Emphasis added.) By its express terms, § 52-557n waives a municipal corporation's governmental immunity "for damages to person or property . . . ." It does not waive its immunity with respect to purely economic or commercial losses. E.g., *Williams Ford, Inc.* v. *Hartford Courant Co.*, 232 Conn. 559, 583, 657 A.2d 212 (1995) (interpreting General Statutes § 52-572h (b) and concluding that "the legislature intended the

phrase 'damage to property' to encompass only its usual and traditional meaning in the law of negligence actions, namely, damage to or the loss of use of tangible property" and that, when drafting legislation, "the legislature [is] mindful of a distinction between property damage and commercial losses"); see *Mountain West Helicopter, LLC* v. *Kaman Aerospace Corp.*, 310 F. Supp. 2d 459, 465 (D. Conn. 2004) ("Connecticut [S]upreme [C]ourt has, in the context of other statutes, recognized a categorical distinction between commercial losses and damage to property" and "[when] the legislature has employed the term 'damage to property,' the . . . court has held that it [was] not intend[ed] to [permit the] recover[y] [of] purely [economic] losses unaccompanied by damages to some tangible property"); see also General Statutes § 52-572h (a) (distinguishing, in negligence actions, between economic damages and noneconomic damages such as "physical pain and suffering"); Restatement (Third), supra, § 2, comment (a), p. 10 ("When [the] Restatement [(Third) of Torts] refers to 'property damage,' it generally means damage to tangible property. Usually the distinction between physical injury and pure economic loss is easy to draw, though it occasionally causes confusion when relatively minor damage to person or property leads to monetary losses on a large scale. It may then seem tempting to describe the plaintiff's losses as purely economic in character. They are not. The property damage at the root of such a loss brings the case within the scope of Restatement [(Third)], Torts: Liability for Physical and Emotional Harm, and the rules stated there. Economic loss that accompanies even minor injury to the plaintiff's person or property does not tend to raise the same considerations found when a plaintiff's losses are economic alone."); id, § 1, comment (c), p. 2 ("[a]n economic loss or injury, as the term is used [in the Restatement (Third) of Torts], means a financial loss not arising from injury

Raspberry Junction Holding, LLC *v.* Southeastern Connecticut Water Authority

to the plaintiff's person or from physical harm to the plaintiff's property'').

"Section 52-557n . . . specifically delineates circumstances under which municipalities and its employees can be held liable in tort and those under which they will retain the shield of governmental immunity." (Citation omitted.) *Durrant* v. *Board of Education*, 284 Conn. 91, 105, 931 A.2d 859 (2007); see also *Doe* v. *Petersen*, 279 Conn. 607, 614, 903 A.2d 191 (2006) ("§ 52-557n abandons the common-law principle of municipal sovereign immunity and establishes the circumstances in which a municipality may be liable for damages" (footnote omitted)). It is axiomatic that "[s]tatutes that abrogate or modify governmental immunity are to be strictly construed." *Rawling* v. *New Haven*, 206 Conn. 100, 105, 537 A.2d 439 (1988). "Since the codification of the common law under § 52-557n [in 1986], this court has recognized that it is not free to expand or alter the scope of governmental immunity therein." *Durrant* v. *Board of Education*, supra, 107. In light of the foregoing, we conclude that the law of Connecticut,[4] insofar as it informs our understanding of the parties' normal expectations, compels the conclusion that neither party reasonably could have expected that the defendant, a municipal corporation, would be liable in negligence for economic losses incurred by its customers as a result of an interruption in the defendant's water service.

Because they are analytically related, we consider together the second and third factors, namely, "the public policy of encouraging participation in the activity,

---

[4] We recognize, as we did in *Raspberry Junction Holding, LLC* v. *Southeastern Connecticut Water Authority*, supra, 331 Conn. 369 n.5, that the defendant did not raise governmental immunity as a special defense in the trial court, and, therefore, that issue is not presently before us. We rely on § 52-557n only insofar as it informs our understanding of the normal expectations of the participants in the activity under review.

while weighing the safety of the participants, and the avoidance of increased litigation . . . .'' (Internal quotation marks omitted.) *Lawrence* v. *O & G Industries, Inc.*, supra, 319 Conn. 658. It is readily conceivable that imposing a duty of care on the defendant under the circumstances of the present case would encourage future plaintiffs to initiate actions of their own in the event of a prolonged interruption in water service. Despite the predictable increase in litigation that would follow such a decision, however, there would be no corresponding increase in public safety. This is so because the receipt of water is an inherently harmless activity, requiring the defendant's customers to do no more than turn a faucet and, periodically, write a check to cover the cost of the water each has used. See id., 658–59 (''It is easy to fathom how affirmatively imposing a duty on the defendants . . . could encourage similarly situated future plaintiffs to litigate on the same grounds; this is true anytime a court establishes a potential ground for recovery. . . . At the same time, the recognition of such a duty fails to provide a corresponding increase in safety . . . .'' (Citation omitted; footnote omitted; internal quotation marks omitted.)); see also id., 660 (''[t]he probability that an increase in litigation will not be offset by an increase in safety gives us particular pause with respect to recognizing a duty'').

In arguing to the contrary, the plaintiff contends that extended interruptions in water service implicate ''a host of safety and sanitary public health problems.'' Relying on this court's statement in *Raspberry Junction Holding, LLC*, that, under § 24 of the special act, ''the defendant is not subject to comprehensive regulation of its rates, services, and facilities by this state's public utilities regulatory authority''; *Raspberry Junction Holding, LLC* v. *Southeastern Connecticut Water Authority*, supra, 331 Conn. 375–76; the plaintiff contends that, because the defendant is not subject to any such regula-

Raspberry Junction Holding, LLC *v.* Southeastern Connecticut Water Authority

tion, "the possibility of civil liability for economic harm is perhaps the one and only avenue" to ensure that the defendant acts with due care to maintain an uninterrupted supply of water, so as to avoid an array of public health and sanitation problems. The statement in *Raspberry Junction Holding, LLC*, was made in the context of explaining why the trial court's reliance on case law from other jurisdictions, as a basis for concluding that the defendant had the authority to immunize itself from liability, was misplaced, namely, because all of the cited cases "involved water authorities subject to such regulatory restrictions and thus implicated a corresponding public policy justification for the right to limit liability . . . ." *Raspberry Junction Holding, LLC* v. *Southeastern Connecticut Water Authority*, supra, 376. Contrary to the plaintiff's contention, however, the defendant is subject to formidable health and safety regulation by various state agencies, the purpose of which is to ensure a safe and continuous supply of water to the defendant's customers. See, e.g., 33 Spec. Acts 493, No. 381, § 34 (1967) ("[n]othing contained in this act shall be held to alter or abridge the powers and duties of the state [D]epartment of [Public] [H]ealth or of the water resources commissions over water supply matters"). One such regulation requires the defendant to have in place a contingency plan for providing water to its customers in the event of a systemwide failure. Specifically, "[u]nder General Statutes § 25-32d (a), water companies are required to submit a water supply plan to the [Commissioner] of [P]ublic [H]ealth for approval 'with the concurrence of the Commissioner of [Energy and] Environmental Protection.' A water supply plan is required to 'evaluate the water supply needs in the service area of the water company submitting the plan and [to] propose a strategy to meet such needs.' General Statutes § 25-32d (b). The plan must 'include  . . . [inter alia] (1) [a] description of existing water supply

Raspberry Junction Holding, LLC *v.* Southeastern Connecticut Water Authority

systems; (2) an analysis of future water supply demands; (3) an assessment of alternative water supply sources which may include sources receiving sewage and sources located on state land; [and] (4) *contingency procedures for public drinking water supply emergencies, including emergencies concerning the contamination of water, the failure of a water supply system or the shortage of water . . . .*' General Statutes § 25-32d (b).'' (Emphasis added; footnotes omitted.) *Miller's Pond Co.*, *LLC* v. *New London*, 273 Conn. 786, 820–22, 873 A.2d 965 (2005).

In light of the foregoing, we are not persuaded that imposing a duty on the defendant to prevent economic loss resulting from interruptions in its water service is required to address the health and sanitation concerns identified by the plaintiff. It is apparent that those concerns have already been addressed by the legislature.[5] See *Lawrence* v. *O & G Industries, Inc.*, supra, 319 Conn. 659 (concluding that imposing duty on defen-

---

[5] We note in this regard that the plaintiff does not actually dispute the defendant's repeated assertion, throughout its brief to this court, that nonpotable water was restored to all of the defendant's customers within twenty-four hours of the explosion at its pumping station such that "the plaintiff's hotel guests could utilize showers, sinks, and flush toilets . . . .'' Nor does the plaintiff dispute that the defendant provided drinking water to all of its customers, including the plaintiff, free of charge throughout the outage. In other words, it would appear that, following the explosion, the defendant implemented the contingency plan required by § 25-32d (b). In its brief, the defendant asserts that it "responded to [the explosion at its pumping station] around 3:30 a.m. and immediately contacted [the] state police, the local fire department, the Connecticut Department of Public Health, the Connecticut Department of Energy and Environmental Protection, and the [federal] Environmental Protection Agency, all of whom responded to and investigated the scene. [It] was not allowed back on the property until it was cleared by these authorities at approximately 7 p.m. Once [it] regained access to the property, it began taking measures to provide water to its customers. It activated an interagency emergency response network, CTWARN, and the Connecticut Water Company responded to [its] request by shipping water to North Stonington from Groton. [It] also immediately began installing a temporary valve in the water main . . . [such that] [n]onpotable water was restored to all North Stonington customers by late evening . . . .''

Raspberry Junction Holding, LLC *v.* Southeastern Connecticut Water Authority

dants to prevent economic loss would not improve physical safety of plaintiffs "given that companies like the defendants are subject to extensive state and federal regulation, and already may be held civilly liable to a wide variety of parties who may suffer personal injury or property damage as a result of their negligence").

Thus, because improving public safety is a primary reason duties are imposed in the first instance, the fact that no duty we could impose on the defendant in the present case would be likely to increase the physical safety of the defendant's customers is a compelling reason not to impose one. See, e.g., *Rizzuto* v. *Davidson Ladders, Inc.*, 280 Conn. 225, 235–36, 905 A.2d 1165 (2006) ("It is sometimes said that compensation for losses is the primary function of tort law . . . [but it] is perhaps more accurate to describe the primary function as one of determining when compensation [is] required. . . . An equally compelling function of the tort system is the prophylactic factor of preventing future harm . . . ." (Internal quotation marks omitted.)); *Lodge* v. *Arett Sales Corp.*, 246 Conn. 563, 583, 717 A.2d 215 (1998) (declining to impose duty on defendants when doing so "would achieve little in preventing the type of harm suffered by the plaintiffs"); see also, e.g., *Ruiz* v. *Victory Properties, LLC*, 315 Conn. 320, 340, 107 A.3d 381 (2015) ("imposing a duty . . . will likely prompt landlords to act more responsibly toward their tenants in the interest of preventing foreseeable harm caused by unsafe conditions in areas where tenants are known to recreate or otherwise congregate"); *Monk* v. *Temple George Associates, LLC*, 273 Conn. 108, 119–20, 869 A.2d 179 (2005) (imposing duty on parking garage owner to "protect customers by [taking] reasonable care to decrease the likelihood of crime occurring on [its] premises"); *Jagger* v. *Mohawk Mountain Ski Area, Inc.*, 269 Conn. 672, 703, 849 A.2d 813 (2004) (imposing duty on skiers because "requiring [them] to participate

Raspberry Junction Holding, LLC *v.* Southeastern Connecticut Water Authority

in the reasonable manner prescribed by the rules of the sport . . . will promote participation in the sport of skiing'' and ''protect the safety'' of those who do participate). We note lastly, with respect to the issue of whether the law should be used to encourage participation in the activity under review, the plaintiff concedes, as it must, that water is an essential necessity of life, and, as such, its use requires no encouragement by the law. In light of the foregoing, we conclude that the second and third factors also weigh heavily against the imposition of a duty.

We turn, therefore, to the final factor, the decisions of other jurisdictions. As the trial court noted and the plaintiff does not dispute, the vast majority of jurisdictions bar recovery of economic losses in a negligence action arising out of damage to the person or property of another. See, e.g., *Lawrence* v. *O & G Industries, Inc.*, supra, 319 Conn. 661–64 (discussing majority rule and reasons for it). ''Courts that reject claims . . . under the economic loss doctrine reason that the primary purpose of the rule is to shield a defendant from unlimited liability for all of the economic consequences of a negligent act, particularly in a commercial or professional setting, and thus to keep the risk of liability reasonably calculable. . . . They posit that the foreseeability of economic loss, even when modified by other factors, is a standard that sweeps too broadly in a professional or commercial context, portending liability that is socially harmful in its potential scope and uncertainty. . . . [See] *In re Chicago Flood Litigation,* [176 Ill. 2d 179, 198, 680 N.E.2d 265 (1997)] (observing that the economic consequences of any single accident are virtually limitless and that [i]f [the] defendants were held liable for every economic effect of their negligence, they would face virtually uninsurable risks far out of proportion to their culpability, and far greater than is necessary to encourage potential tort defendants to

Raspberry Junction Holding, LLC *v.* Southeastern Connecticut Water Authority

exercise care in their endeavors . . .).'' (Citations omitted; footnote omitted; internal quotation marks omitted.) *Lawrence* v. *O & G Industries, Inc.*, supra, 664; see also *Southern California Gas Leak Cases*, 7 Cal. 5th 391, 403, 441 P.3d 881, 247 Cal. Rptr. 3d 632 (2019) (majority consensus ''cuts sharply against imposing a duty of care to avoid causing purely economic losses in negligence cases like this one: where purely economic losses flow not from a financial transaction meant to benefit the plaintiff (and which is later botched by the defendant), but instead from an industrial accident caused by the defendant (and which happens to occur near the plaintiff'')).

The majority rule and its rationale are set forth in the Restatement (Third) of Torts, which provides that, ''[e]xcept as provided elsewhere in this Restatement, a claimant cannot recover for economic loss caused by: (a) unintentional injury to another person; or (b) unintentional injury to property in which the claimant has no proprietary interest.'' Restatement (Third), supra, § 7, p. 64. Comment (a) to § 7 explains that ''[t]he two limits on recovery stated in this [s]ection are related applications of the same principle, and they apply to facts that usually have certain features in common. The plaintiff and defendant typically are strangers. The defendant commits a negligent act that injures a third party's person or property, and indirectly—though perhaps foreseeably—causes various sorts of economic loss to the plaintiff: lost income or profits, missed business opportunities, expensive delays, or other disruption. The plaintiff may suffer losses, for example, because the defendant injured someone with whom the plaintiff had a contract and from whom the plaintiff had been expecting performance, such as an employee or supplier. . . . Or the plaintiff may be unable to make new contracts with others, such as customers who cannot conveniently reach the plaintiff's business because

the defendant's negligence has damaged property that now blocks the way. . . . The common law of tort does not recognize a plaintiff's claim in such circumstances.'' (Citations omitted.) Id., comment (a), p. 65.

The Restatement (Third) of Torts further explains that the rule ''is justified by several considerations. The first . . . is that economic losses can proliferate long after the physical forces at work in an accident have spent themselves. A collision that sinks a ship will cause a well-defined loss to the ship's owner; but it also may foreseeably cause economic losses to wholesalers who had expected to buy the ship's cargo, then to retailers who had expected to buy from the wholesalers, and then to suppliers, employees, and customers of the retailers, and so on. Recognizing claims for those sorts of losses would greatly increase the number, complexity, and expense of potential lawsuits arising from many accidents. Recognition of such claims might also result in liabilities that are indeterminate and out of proportion to the culpability of the defendant. These costs do not seem likely to be justified by comparable benefits. Courts doubt that threats of open-ended liability would usefully improve the incentives of parties to take precautions against accidents or would make a material contribution to the cause of fairness.

''At the same time, the victims of economic injury often can protect themselves effectively by means other than a tort suit. They may be able to obtain first-party insurance against their losses,[6] or recover in contract

---

[6] We agree with the trial court's observation that ''[t]he economic loss doctrine seeks to maintain the fundamental distinction between tort law and contract law, and encourages the party best situated to assess the risk of economic loss, generally the commercial purchaser, to assume, allocate, or insure against that risk. . . . Here, the plaintiff did exactly that. It assessed the risk of the economic losses it could sustain due to an interruption in its water service, and [insured] against that risk [through the purchase of utility service interruption insurance].'' (Citations omitted.) The trial court further observed, and the record reflects, that the plaintiff ''was in fact compensated for some of the economic losses it sustained through [that]

Raspberry Junction Holding, LLC *v.* Southeastern Connecticut Water Authority

from those who do have good claims against the defendant. Those contractual lines of protection against economic loss, where available, are considered preferable to judicial assignments of liability in tort. . . . The rationales just stated are general, and no one of them is conclusive. They prevail by their cumulative force. And while they do not apply equally to every claim that arises under this [s]ection, most courts reject such claims categorically.'' (Citation omitted; footnote added.) Id., comment (b), p. 66.

The plaintiff contends, nevertheless, that a number of jurisdictions recognize an exception to this general rule when a special relationship exists between the parties. In those cases, the plaintiff argues, courts have permitted recovery when ''the plaintiff was an intended beneficiary of a particular transaction but was harmed by the defendant's negligence in carrying it out''; *Southern California Gas Leak Cases*, supra, 7 Cal. 5th 400; or when ''a special and narrowly defined relationship can be established between the tortfeasor and a plaintiff who was deprived of an economic benefit . . . . In cases of that nature, the duty exists because of the special relationship. The special class of plaintiffs involved in those cases were particularly foreseeable to the tortfeasor, and the economic losses were proximately caused by the tortfeasor's negligence.'' *Aikens*

insurance [policy],'' only ''not enough to cover its losses, which led to the commencement of this action.'' Finally, the court noted that the defendant's rules governing water service, which are incorporated by reference into the parties' contract, reserve the right of the defendant ''at any time, without notice, to shut off the water in its mains for the purpose of making repairs or . . . for other purposes.'' Southeastern Connecticut Water Authority, supra. As the trial court aptly noted, this provision put ''the defendant's customers . . . on notice that they should obtain utility service interruption insurance,'' and, ''[g]iven the number and variety of customers it serves, the defendant has no ability to predict the severity of economic damages that a prolonged interruption in its water services could cause . . . any individual customer,'' whereas the defendant's customers are perfectly capable of making that determination for themselves.

v. *Debow*, 208 W. Va. 486, 500, 541 S.E.2d 576 (2000); see also *Lips* v. *Scottsdale Healthcare Corp.*, 224 Ariz. 266, 268, 229 P.3d 1008 (2010) ("Courts have not recognized a general duty to exercise reasonable care for the purely economic well-being of others, as distinguished from their physical safety or the physical safety of their property. . . . This reticence reflects concerns to avoid imposing onerous and possibly indeterminate liability on defendants and undesirably burdening courts with litigation. . . . Consequently, commentators have recognized that liability for negligence [in such cases] . . . must depend upon the existence of some special reasons for finding a duty of care." (Citations omitted; internal quotation marks omitted.)).

The plaintiff argues that a special relationship existed between the parties in the present case by virtue of the "imbalance of power" between them, as evidenced by the parties' water service agreement, which the plaintiff argues "[is] really an adhesion contract . . . ." The plaintiff further argues that its losses were particularly foreseeable to the defendant because it is universally understood that hotels require a constant supply of water to provide "comfort and cleanliness" to their guests. We are not persuaded.

Indeed, the plaintiff has not cited a single case in which a special relationship was found to exist on remotely similar facts. As is evident from each of the cases cited in the plaintiff's appellate brief, courts have found a special relationship to exist between the parties when the plaintiff was either the intended beneficiary of a particular transaction or was physically situated within the zone of risk created by the defendant's negligence such as to make the plaintiff's economic losses particularly foreseeable to the defendant. See, e.g., *Mattingly* v. *Sheldon Jackson College*, 743 P.2d 356, 358 (Alaska 1987) (plaintiff's economic losses were particularly foreseeable when defendant excavated and braced

a trench so plaintiff's employees could perform work and trench subsequently collapsed on three employees, causing plaintiff to incur business losses due to injured employees' absence from work); *People Express Airlines, Inc.* v. *Consolidated Rail Corp.*, 100 N.J. 246, 248–49, 495 A.2d 107 (1985) (airline's commercial losses resulting from forced cancellation of flights due to chemical leak in railroad yard adjacent to airport were particularly foreseeable to defendant railroad).

As the California Supreme Court explained in *Southern California Gas Leak Cases*, which also is cited in the plaintiff's brief: "What we mean by special relationship is that the plaintiff was an intended beneficiary of a particular transaction but was harmed by the defendant's negligence in carrying it out. Take, for example, *Biakanja* v. *Irving* [49 Cal. 2d 647, 320 P.2d 16 (1958)]. There, we held that the intended beneficiary of a will could recover for assets she would have received if the notary had not been negligent in preparing the document. . . . A special relationship existed between the intended beneficiary and the notary in *Biakanja*, we emphasized, because the end and aim of the transaction between the nonparty decedent and the notary [were] to ensure that the decedent's estate passed to the intended beneficiary." (Citation omitted; internal quotation marks omitted.) *Southern California Gas Leak Cases*, supra, 7 Cal. 5th 400; see id. (plaintiff business owners could not recover economic losses resulting from forced closure of their businesses due to massive gas leak).

It is clear, moreover, that to be particularly foreseeable within the meaning of the exception means that "the particular plaintiff is affected differently from society in general [and the plaintiff's economic losses were particularly foreseeable to the defendant]. It may be evident from the defendant's knowledge or specific reason to know of the potential consequences of the wrong-

doing, the persons likely to be injured, and the damages likely to be suffered.'' *Aikens* v. *Debow*, supra, 208 W. Va. 499. Suffice it to say that the plaintiff has not identified any attribute of the relationship between itself and the defendant that would bring the present case into the ''extremely limited group of cases [in which] the law of negligence extends its protections to a party's economic interest.'' (Internal quotation marks omitted.) *Blahd* v. *Richard B. Smith, Inc.*, 141 Idaho 296, 301, 108 P.3d 996 (2005). The plaintiff is simply one of thousands of customers throughout southeastern Connecticut who subscribe to the defendant's water service. The plaintiff's assertions to the contrary notwithstanding, there is nothing to suggest that a water outage affects the plaintiff materially differently from any of the defendant's other customers in the restaurant and hospitality industry, or that, based on the defendant's specific knowledge of the plaintiff's business, the plaintiff's losses, in contrast to those of other customers, were particularly foreseeable and calculable to the defendant. Accordingly, we reject the plaintiff's contention that the fourth factor favors the plaintiff because the present case falls within an exception to the general rule barring recovery of economic losses in cases such as the present one.

In light of the foregoing, we conclude that the trial court correctly determined that public policy does not support the imposition of a duty on the defendant under the circumstances of this case.

The judgment is affirmed.

In this opinion ROBINSON, C. J., and McDONALD, D'AURIA, MULLINS and KAHN, Js., concurred.

ECKER, J., concurring. I concur in the result reached by the majority, but I write separately to express my view that we have started down the wrong road by

Raspberry Junction Holding, LLC *v.* Southeastern Connecticut Water Authority

deciding economic loss cases using what the majority accurately refers to as "the well established [four factor, duty] test first articulated in *Jaworski* v. *Kiernan*, 241 Conn. 399, 404, 696 A.2d 332 (1997) . . . ." That test may have been helpful for resolving the idiosyncratic issue presented in that case, namely, whether participants in a team contact sport owe each other a duty of care, but it has limited applicability outside of that context. The *Jaworski* test is particularly ill-suited to a case like the present one, which involves economic loss unaccompanied by personal injury or property damage, and raises very different policy and doctrinal issues from those confronted in *Jaworski*. Unfortunately, a formulation that was fabricated for narrow application in one specific and peculiar context nearly twenty-five years ago has since been uncritically adopted by this court as a one-size-fits-all test for deciding the policy prong of the duty analysis in *all* negligence cases, including economic loss cases like the present one. There are far better and more sophisticated tools available for this purpose, and I am hopeful that future cases will provide us with the opportunity to use them.

Before I proceed, I emphasize that I do not fault the majority for applying the *Jaworski* test in this case. The parties did not offer any alternative analysis to address the policy issues underlying the legal question on appeal. And their advocacy choice is understandable because this court has signaled that *Jaworski* provides the proper framework for determining whether a plaintiff may recover damages for purely economic losses caused by a defendant's alleged negligence. See *Lawrence* v. *O & G Industries, Inc.*, 319 Conn. 641, 650–51, 126 A.3d (2015). Nor, when we had the chance to do so, did we redirect the parties or suggest a different approach when this case first appeared before us on appeal. See *Raspberry Junction Holding, LLC* v. *Southeastern Connecticut Water Authority*, 331 Conn. 364,

Raspberry Junction Holding, LLC *v.* Southeastern Connecticut Water Authority

368 n.3, 378, 203 A.3d 1224 (2019) (stating that we have not yet decided whether to adopt economic loss doctrine, citing *Lawrence*, and remanding case for adjudication of defendant's claim that damages for purely economic loss are barred by that doctrine). So here we are.

It is necessary to review *Jaworski* to understand why its four factor test provides a poor framework for deciding whether policy considerations favor or disfavor allowing recovery in negligence for pure economic loss. The plaintiff in *Jaworski* sustained personal injuries playing in a coed recreational soccer league when an opposing player made contact with her during a game. *Jaworski* v. *Kiernan*, supra, 241 Conn. 400. She filed an action in two counts against the player who caused her injuries, alleging negligence and recklessness. Id., 400–401. The jury returned a verdict in the plaintiff's favor on the negligence count and in the defendant's favor on the recklessness count. Id., 401. The issue on appeal was whether the defendant owed the plaintiff a duty of care on the basis of which liability could be imposed for ordinary negligence. See id., 407, 412.

In resolving that issue, we observed that, "[a]lthough it has been said that no universal test for [duty] ever has been formulated; [W. Keeton et al., Prosser and Keeton on the Law of Torts (5th Ed. 1984)] § 53, p. 358; our threshold inquiry has always been whether the specific harm alleged by the plaintiff was foreseeable to the defendant." (Internal quotation marks omitted.) *Jaworski* v. *Kiernan*, supra, 241 Conn. 405. To determine whether the harm is foreseeable, we ask, "would the ordinary [person] in the defendant's position, knowing what he knew or should have known, anticipate that harm of the general nature of that suffered was likely to result?" (Internal quotation marks omitted.) Id.

But the law has long recognized that foreseeability is not enough. The court in *Jaworski* explained the

340 Conn. 200 DECEMBER, 2021 233

Raspberry Junction Holding, LLC *v.* Southeastern Connecticut Water Authority

underlying idea: "Many harms are quite literally foreseeable, yet for pragmatic reasons, no recovery is allowed. . . . A further inquiry must be made, for we recognize that duty is not sacrosanct in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection. . . . Every injury has ramifying consequences, like the ripplings of the waters, without end. The problem for the law is to limit the legal consequences of wrongs to a controllable degree. . . . The final step in the duty inquiry, then, is to make a determination of 'the fundamental policy of the law, as to whether the defendant's responsibility should extend to such results." (Citations omitted; internal quotation marks omitted.) Id., 406.

This brings us to the four part *Jaworski* test, which was formulated "to determine as a matter of policy the extent of the legal duty to be imposed [on] the defendant." Id., 407. The court determined that four "policy" questions were determinative of the duty inquiry: "(1) the normal expectations of participants in the sport in which the plaintiff and the defendant were engaged; (2) the public policy of encouraging continued vigorous participation in recreational sporting activities while weighing the safety of the participants; (3) the avoidance of increased litigation; and (4) the decisions of other jurisdictions."[1] Id. Applying these four factors

---

[1] In my view, insufficient attention has been paid to the fact that the four factor test "first articulated" in *Jaworski* was conjured out of thin air. To the best of my knowledge, the test has no discernable source in any case law from Connecticut or anywhere else. Nor was it drawn from the Restatement of Torts, scholarly commentary, or out-of-state legal authority. Although *Jaworski* cites to one of this court's earlier cases as supporting authority for the four factors, that case does not contain even the rudimentary elements of the *Jaworski* formulation. See *Jaworski* v. *Kiernan*, supra, 241 Conn. 407, citing *Maloney* v. *Conroy*, 208 Conn. 392, 400–401, 545 A.2d 1059 (1988); see also *Maloney* v. *Conroy*, supra, 400–401 (bystander to medical malpractice cannot recover damages for emotional distress caused by witnessing patient's gradual decline). To the contrary, *Maloney* emphasizes the unique nature of cases involving negligence claims for bystander

Raspberry Junction Holding, LLC *v.* Southeastern Connecticut Water Authority

in the context of team contact sports, we held that participants owe other players a legal duty to refrain from reckless or intentional conduct; "[p]roof of mere negligence is insufficient to create liability." Id., 412.

My problem with the *Jaworski* test can be stated broadly or narrowly. The broad version would question the utility of the test in most negligence cases, even those involving negligence claims for personal injuries. Although the four factors enumerated in *Jaworski* may identify the right considerations for deciding the policy prong of the duty analysis in the unique factual circumstances of that case, I am doubtful that it is the right test for adjudicating the existence or scope of a duty in personal injury cases arising from other contexts.[2] A moment's reflection reveals a host of other or additional policy related considerations that courts and commentators have long consulted as part of the duty analysis in negligence cases generally.[3] To be sure, at the most

emotional distress arising out of medical malpractice and affirmatively *rejects* the argument that the liability rule in that specialized context should be the same "as it is in negligence cases generally . . . ." *Maloney* v. *Conroy*, supra, 400. The court in *Maloney* observed that "[m]ost of the courts and commentators that have considered the matter . . . have recognized the necessity for imposing some rather arbitrary limitations on the right of a bystander to recover for emotional distress that are not applied in other negligence actions." Id., 400–401.

[2] This court has applied the four part *Jaworski* test in a wide range of personal injury cases that have nothing to do with team contact sports. See, e.g., *Grenier* v. *Commissioner of Transportation*, 306 Conn. 523, 526–27, 544, 51 A.3d 367 (2012) (duty of fraternity to conduct safe events off premises); *Monk* v. *Temple George Associates*, *LLC*, 273 Conn. 108, 114, 118, 869 A.2d 179 (2005) (duty to provide adequate security in parking garage). Nothing in *Jaworski*, however, indicates that the four part test was intended for general application in other areas of personal injury law. To the contrary, the test, as formulated in *Jaworski*, is not framed as a generic cost-benefit test or a broadly applicable public policy inquiry but, instead, is narrowly couched in specific terms relating only to sports related personal injuries. See *Jaworski* v. *Kiernan*, supra, 241 Conn. 408 (balancing "the relevant public policy considerations surrounding sports injuries arising from team contact sports").

[3] It is hard to know where to begin, and I will not do so here beyond quoting the following observation, written almost sixty years ago, to illustrate

340 Conn. 200  DECEMBER, 2021  235

Raspberry Junction Holding, LLC *v.* Southeastern Connecticut Water Authority

abstract level, policy considerations are relevant in many cases in which courts are asked to limit, expand, or create common-law liability rules; they play a significant role in tort cases generally and negligence actions in particular. See, e.g., *Mueller* v. *Tepler*, 312 Conn. 631, 650, 95 A.3d 1011 (2014) ("[t]he issue of whether to recognize a common-law cause of action . . . is a matter of policy for the court to determine based on the changing attitudes and needs of society" (internal quotation marks omitted)). It also is true that our modern negligence jurisprudence tends[4] to treat policy questions as part of the duty analysis. See, e.g., *Greenwald* v. *Van Handel*, 311 Conn. 370, 375, 88 A.3d 467 (2014) ("this court examines policy questions in negligence cases within the analytic framework of the duty element").

---

the basic point: "An affirmative declaration of duty simply amounts to a statement that two parties stand in such relationship that the law will impose on one a responsibility for the exercise of care toward the other. Inherent in this simple description are various and sometimes delicate policy judgments. The social utility of the activity out of which the injury arises, compared with the risks involved in its conduct; the kind of person with whom the actor is dealing; the workability of a rule of care, especially in terms of the parties' relative ability to adopt practical means of preventing injury; the relative ability of the parties to bear the financial burden of injury and the availability of means by which the loss may be shifted or spread; the body of statutes and judicial precedents which color the parties' relationship; the prophylactic effect of a rule of liability; in the case of a public agency defendant, the extent of its powers, the role imposed [on] it by law and the limitations imposed [on] it by budget; and finally, the moral imperatives which judges share with their fellow citizens—such are the factors which play a role in the determination of duty." *Raymond* v. *Paradise Unified School District*, 218 Cal. App. 2d 1, 8, 31 Cal. Rptr. 847 (1963)

[4] Policy questions are by no means confined to the duty analysis in negligence law. Examples abound. See, e.g., *Hall* v. *Burns*, 213 Conn. 446, 479, 569 A.2d 10 (1990) ("[c]onstructive notice is premised on the policy determination that under certain circumstances a person should be treated as if he had actual knowledge so that one should not be permitted to deny knowledge when he is acting so as to keep himself ignorant" (internal quotation marks omitted)); *Kowal* v. *Hofher*, 181 Conn. 355, 357–58, 436 A.2d 1 (1980) (policy determination rejecting liability for negligent provision of alcohol as part of proximate causation analysis).

Raspberry Junction Holding, LLC *v.* Southeastern Connecticut Water Authority

But, when we descend from abstraction to examine the issues at stake in any particular case or class of cases, it is obvious that *different* policy questions are implicated in different contexts within negligence law. A wide array of policy considerations will arise depending on the type of case, and the associated doctrinal variations are correspondingly various.[5] Distinct doctrines—some duty related, some not—implicating distinct policy considerations will apply depending on the status and characteristics of the respective parties (e.g., minor or adult, trespasser or invitee), the relationship between the parties (e.g., fiduciary, custodial, or professional), the character of the alleged negligence (e.g., omission or commission), and the nature of the harm at issue (e.g., physical, emotional, economic, or a combination). The four factor *Jaworski* test does not even begin to address or account for the various policy considerations at play in many cases. Nor was it originally intended to do so.

The narrow version of this critique is confined to cases, like the present case, involving a negligence claim for pure economic loss. Whatever the utility of the *Jaworski* test in other contexts, it is ill-suited to decide whether damages for pure economic loss should be recoverable in a negligence action because the relevant

---

[5] See, e.g., D. Owen, "Duty Rules," 54 Vand. L. Rev. 767, 773–74 (2001) ("Among the many recurring categories of cases in which courts have come to understand that negligent conduct (negligence-as-breach) should not always give rise to liability, even when the plaintiff and the risk were both entirely foreseeable, are claims involving injuries to third persons (by manufacturers, professionals, employers, social hosts providing guests with alcohol, and probation officers), harm to unborn plaintiffs, nonfeasance (involving the extent of a duty to rescue or otherwise affirmatively to act), landowner liability (to trespassers and other uninvited guests), and damage to nonphysical interests (especially emotional harm and pure economic loss). In contexts such as these, where the appropriateness of allowing recovery under the law of negligence is unclear, twentieth century courts came to recognize the importance of duty's threshold, gatekeeper role." (Footnotes omitted.)).

policy considerations in this particular context are so different. Judge Richard A. Posner, no stranger to cost-benefit analysis in the law, made this point more than three decades ago in a negligence case for purely economic loss involving two commercial parties. See *Rardin* v. *T & D Machine Handling, Inc.*, 890 F.2d 24, 28–29 (7th Cir. 1989) (observing that "there are . . . differences between the [personal injury] case and the [economic loss] case, whether in a stranger or in a contractual setting"). Indeed, the drafters of the Restatement (Third) of Torts viewed the differences between the two contexts as sufficiently meaningful that they chose to write one treatise covering negligence resulting in physical and emotional harm and a separate treatise addressing the legal rules that apply to unintentional conduct resulting in economic harm.[6]

One example relevant to the present case suffices for illustrative purposes. The important issue of physical safety addressed in the second *Jaworski* factor is not present at all in the present case, which involves a claim by a commercial entity seeking lost business profits. The effort to fit the square peg of the claimed economic loss into the round hole of physical health and safety is doomed to fail because the cost-benefit considerations that inform the relevant "policy" analysis in the present case do not relate to health or safety; instead, they relate to commercial concerns involving risk allocation,

---

[6] Section 1 (1) of the Restatement (Third) of Torts, Liability for Economic Harm, provides that, in general, "[a]n actor has no general duty to avoid the unintentional infliction of economic loss on another." Restatement (Third), Torts, Liability for Economic Harm § 1 (1), p. 1. The Restatement (Third) of Torts, Liability for Economic Harm, further provides that "there is no liability in tort for economic loss caused by negligence in the performance or negotiation of a contract between the parties." Id., § 3, p. 13. There are exceptions to these general rules, however, for, among other torts, professional negligence; see id., § 4, p. 23; negligent misrepresentation; see id., § 5, pp. 35–36; and negligent performance of services. See id., § 6, pp. 62–63.

Raspberry Junction Holding, LLC *v.* Southeastern Connecticut Water Authority

market alternatives, and whatever other economic consequences may flow from the proposed legal rule. Policy concerns relevant to tort law exist outside of the realm of health and safety in negligence claims for economic loss involving professional malpractice, breach of fiduciary duty, misrepresentation, and so forth. The majority in the present case does its level best—indeed, it skillfully works within the constraints of the *Jaworski* framework—to conform the factors to better address some of the relevant policy considerations, but the fact remains that the factors are ill-suited to the inquiry at hand.[7]

In the end, the demands of *Jaworski* may have caused us to lose sight of the basic facts and legal considerations relevant to this case. The plaintiff, Raspberry Junction Holding, LLC, and the defendant, Southeastern Connecticut Water Authority, have a direct, *contractual* relationship with one another, and breach of contract is the true basis of the plaintiff's claim. The tort claim is a breach of contract case dressed up in negligence garb, and it seems to me that any recovery of lost profits under these particular circumstances should be controlled by contract principles governing consequential damages. See Restatement (Third), Torts, Liability for Economic Harm § 3, p. 13 (2020) (generally, "there is no liability in tort for economic loss caused by negligence in the performance or negotiation of a contract

---

[7] The first *Jaworski* factor (regarding the reasonable expectations of the parties) could be made relevant to the issues raised in the present case, but only under a substantially reformulated doctrine. Even then, any overlap seems more a matter of fortuity rather than doctrinal consonance. The third *Jaworski* factor (avoidance of increased litigation) appears to be designed to cut only in one direction and fails to ask how to measure the increase or whether the costs imposed may be offset by a countervailing decrease in transaction costs elsewhere in the system. The fourth *Jaworski* factor (the law in other jurisdictions) can and should be included in any analysis of this nature, but as a matter of persuasive authority rather than doctrinal command.

Raspberry Junction Holding, LLC *v.* Southeastern Connecticut Water Authority

between the parties''). The situation is no different than if the defendant delivered its water by truck instead of pipeline, and its lone delivery vehicle became inoperable due to careless maintenance, with the same consequences for the plaintiff's hotel business. Indeed, ''[t]he spirit of *Hadley* v. *Baxendale*, 9 Ex. 341, 156 Eng. Rep. 145 (1854), still the leading case on the nonrecoverability of consequential damages in breach of contract suits, broods over this case . . . although the present case is a tort case rather than a contract case.'' *Rardin* v. *T & D Machine Handling, Inc.*, supra, 890 F.2d 26; cf. 1 Restatement (Third), Torts, Liability for Physical and Emotional Harm, § 7, comment (d), p. 80 (2010) (''one reason the general duty of reasonable care . . . is limited to physical harm is that liability for purely economic harm in commercial cases often raises issues better addressed by contract law or by the tort of misrepresentation'').

I hope that we will be presented with a legal and factual record in some future case that will permit us to consider an alternative framework for adjudicating claims of economic loss unaccompanied by personal injury or property damage.[8] In the meantime, I agree with the majority that ''public policy does not support the imposition of a duty on the defendant under the circumstances of this case,'' and, therefore, I respectfully concur.

---

[8] I do not suggest any particular solution to the problems that I identify in this opinion because there has been no briefing by the parties and no deliberation among my colleagues regarding alternatives to the *Jaworski* test. I feel obligated to raise the issues (or at least justified in doing so) because, as this very case illustrates, we cannot expect trial courts or lawyers to depart from the course we have charted under *Jaworski*, at least not without an indication from this court that a different approach may be preferable.